**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JOHN G. BILLERO & MARLENE
BILLERO,

                        Plaintiffs,

v.

WACHOVIA MORTGAGE, FSB, ET AL.,

                       Defendants.

Civ. No. 10-1744 (DRD)

**O P I N I O N**

*Appearances by:*

TOBIAS & KAPLAN
by:  Kenneth C. Ho, Esq. and David H. Kaplan, Esq.
1107 Convery Boulevard
Perth Amboy, NJ 08661

      *Attorneys for Plaintiffs*

REED SMITH, LLP
by:  Kellie A. Lavery, Esq.
136 Main Street, Suite 250
Princeton, NJ 08540

      *Attorneys for Defendant Wachovia Mortgage, FSB*

**DEBEVOISE, Senior District Judge**

      This matter comes before the Court on a motion submitted by Defendant Wachovia

Mortgage, FSB ("Wachovia") requesting judgment on the pleadings pursuant to Federal Rule of

Civil Procedure 12(c) dismissing the claims asserted against it by Plaintiffs, John G. Billero and

Marlene Billero.  For the reasons set forth below, the Motion will be granted and Plaintiffs'
claims will be dismissed.

## I.  BACKGROUND

Plaintiffs are a married couple who own a single-family home located in Roselle, New
Jersey.  Prior to the events that give rise to this action, that home was encumbered by two
mortgages.

In April 2008, Plaintiffs sought to refinance and consolidate the two mortgages
outstanding on their home.  Plaintiffs allege that they did so after being contacted by an
employee of National Future Mortgage ("NFM"), who told them that they could consolidate their
two mortgages into one fixed rate loan with a monthly payment of $1,113.75 that would be
applied to both principal and interest.  (Compl. ¶ 14.)  NFM and its employees apparently
arranged for Wachovia to provide financing for the transaction.  During a meeting on April 16,
2008, Plaintiffs consummated that transaction by executing several documents, the cumulative
effect of which provided that Wachovia would grant Plaintiffs a loan in the amount of $225,000,
secured by a mortgage on their home.  Plaintiffs used the proceeds of that loan to repay their
other two mortgages (which at the time totaled $215,285), thus effectively consolidating the
debts secured by their residence into one obligation owed to Wachovia.

Among the various documents[1] executed by Plaintiffs on April 16, 2008 were (1) a
"Uniform Residential Loan/Equity Line of Credit Application" (the "Loan Application"), (2) an

---

[1] Plaintiffs did not attach all of the various loan agreements and disclosures they executed on
April 16, 2008 as exhibits to their Complaint.  However, their claims specifically rely on those
documents.  See, e.g., (Compl. ¶¶ 19-22, 29, 31) (referring to the various loan agreements and
disclosures and stating that Plaintiffs "would not have executed the loan if they had been given
the right disclosures.")  Therefore, the Court may consider the loan agreements and disclosures
executed by Plaintiffs on April 16, 2008, which Wachovia submitted along with its Answer,
without converting the pending Motion into a request for summary judgment.  In re Burlington
Coat Factory Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (Although, "[a]s a general matter, a

"Adjustable Rate Mortgage Note" (the "ARM Note"), and (3) a "Mortgage" on their home

securing that Note.  The first specified the "amortization type" for the loan Plaintiffs sought as

"ARM" rather than "fixed rate."  (Def.'s Answer, Ex. E at 1.)  Additionally, the Loan

Application stated that Plaintiffs' combined income was $12,050 per month – $8,500 of which

was attributed to Mr. Billero's work as a "self-employed quality craftsman" in the construction

industry, while $3,550 was derived from Mrs. Billero's work as a customer service

representative for a major insurance company.  (Id. at 1-2.)  Finally, the Loan Application set

forth the various fees that would be associated with the transaction, stating that the portion of the

$225,000 loan paid to Plaintiffs would be reduced by $7,601.92 in closing costs.  (Id. at 3.)  Both

Plaintiffs signed the Loan Application, which was three pages long without a short addendum

setting forth their various financial liabilities, on the top of the first page and the bottom of the

last.  They initialed the bottom of the first and second pages.  Just above the signature block on

its third page, the Loan Application included an acknowledgement which stated, in relevant part:

> Each of the undersigned specifically represents to the Lender … that the
> information contained in this application is true and correct as of the date set forth
> opposite my signature and … the Lender … may continuously rely on the
> information contained in this application.

(Id.)

The terms and conditions of Plaintiffs' loan were set forth in the ARM Note.  The titles of

that Note are somewhat confusing.  It bore the large bold-face title of "Adjustable Rate Mortgage

Note," but included a subtitle stating that Plaintiffs had entered a "Fixed Advantage Pick-A-

Payment Loan" – apparently the designation used by Wachovia for the type of debt obligation at

issue in this case.  (Def.'s Answer, Ex. A at 1.)   Immediately under that subtitle, it stated

---

district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings
… [but] a document integral to or explicitly relied upon in the complaint may be considered
without converting the motion to dismiss into one for summary judgment.") (emphasis in
original, internal citations and quotations omitted).

"(Monthly Interest Rate Changes)" in a similar font and typeface.  (Def.'s Answer, Ex. A at 1.)
It then included a paragraph in slightly smaller boldfaced type, in which it stated that "THIS
NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE,
MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE."  (Id.)  Thus, while
the ARM Note used the word "fixed" in one of its subtitles, its title section disclosed in three
other places that the loan Plaintiffs were entering was an "adjustable rate" rather than "fixed
rate" mortgage.

 The substance of the ARM Note included terms elaborating on that disclosure.  Under a
heading titled "Interest Rate," it specifically stating that the interest rate paid by Plaintiffs would
vary throughout the life of their loan.  (Def.'s Answer, Ex. A at 1, ¶ 2.)  Thus, while the ARM
Note provided for an initial annual interest rate of initial annual interest rate of 7.8 percent, (id. at
1, ¶ 2(A)), that rate could rise to a yearly maximum of 11.95 percent of the loan balance – a price
referred to as the "Lifetime Rate Cap."  (Id. at 1, ¶ 2(C).)  After setting out the Plaintiffs' initial
interest rate and the Lifetime Rate Cap, the ARM Note went on to specify exactly how Plaintiffs'
variable interest rate would be calculated each month, providing that it would be set by adding
3.150 percentage points to the so-called "Cost of Savings Index," a weighted average of interest
rates on personal deposits held by Wachovia throughout the United States.  (Id. at 2, ¶ 2(D)-(E).)
The variations in Plaintiffs' interest rate began on June 15, 2008, two months after the ARM
Note's date of execution.  (Id. at 1, ¶ 2(B).)  Their interest was recalculated each month
thereafter.  (Id.)

 While Plaintiffs' interest rate varied each month, however, the amount of their payments
did not.   Rather, the ARM Note specified that Plaintiffs' initial monthly payment would be
$1,113.47 – slightly less than the $1,113.75 they claim NFM assured them they would be

4

required to pay each month – and would not vary until June 15, 2013, over five years after the effective date of the loan.  (Id. at 2, ¶ 3(B).)  After that date, their monthly payment would be recalculated on a yearly basis.  (Id. at 2, ¶ 3(C).)  Moreover, the ARM Note included a "Payment Cap" provision, which stated that the amount of Plaintiffs' monthly payment could not be increased by more than 7.5 percent each year.  (Id. at 2, ¶ 3(D).)  Thus, Plaintiffs' initial monthly payment of $1,113.47 could not have been raised by more than $83.51 on June 15, 2013.  The maximum increase for the following years would have been $89.77 per month on June 15, 2014 and $96.51 per month on June 15, 2014.  In other words, the ARM Note called for aggregate minimum payments of $13,361.64 each year for the first five years of the loan, which could then increase to $14,363.76 in the sixth, $15,441.00 in the seventh, $16,599.12 in the eighth, and so on in subsequent years.

The Payment Cap provision and Plaintiffs' low initial monthly payment combined with another provision in the ARM Note to create a situation in which it was virtually assured that the principal of Plaintiffs' loan would increase, rather than decrease, over at least the first 15 years of its term if Plaintiffs made only the minimum payment each month.  The ARM Note included a section governing what it referred to as "Deferred Interest," which provided that if Plaintiffs' monthly payments were not sufficient to cover the interest accrued in any given month, the difference between the amount of that interest and the amount paid would be added to their principal.  (Id. at 3, ¶ 3(E).)  The original principal balance of Plaintiffs' loan was $225,000, and the initial annual interest rate on that balance was 7.8 percent.  Thus, the loan was designed so that interest would accrue at a rate of $1,462.50 per month.  Since Plaintiffs' initial monthly payment was only $1,113.47, the loan's principal increased by $349.03 during the first month. With each passing month, that amount compounded as the difference between the previous

month's interest and Plaintiffs' payment was added to the principal. In sum, the loan's design –
the combination of the deferred interest provision, the starting principal of $225,000, and the
initial payment of $1,113.47 – ensured that even without an increase in the monthly interest rate,
the amount outstanding on the loan would grow by over $4,200 during the first year of its term,
with greater increases in subsequent years. Indeed, the interest rate would have had to drop
almost two full points to an annual rate of less than 5.94 percent before the amount of interest
accrued each month would have decreased enough to be covered by Plaintiffs' payments. For
those payments to have dispensed with $5,000 of principal during the first year – a reduction
roughly in keeping with a payment plan that would discharge the loan before its 30-year term
expired – the annual interest rate would have had to drop another two points, to 3.72 percent.[2]

  Plaintiffs could have overcome the negative amortization caused by the Deferred Interest
and Payment Cap provisions by exceeding their required monthly payments. However, they
could not do so by too great an amount without risking other charges. The ARM Note included a
provision that imposed a prepayment charge of two percent on payments of more than $5,000 in
any calendar month during the first three years of the loan term. (Id. at 3, ¶ 5.) The prepayment
penalty did not apply to payments on deferred interest, and expired three years after the
origination of the loan. (Id.) The final page of the ARM Note included a "notice to borrowers,"
which stated that "BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT
CHARGE UNDER CERTAIN CIRCUMSTANCES. PLEASE READ THIS ENTIRE NOTE
(INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT." (Id. at 6.) Both
of the Plaintiffs signed the ARM Note on lines provided just under that acknowledgement. (Id.)

---

[2] Loans on which the minimum monthly payments are less than the monthly interest, such as the
one in this case, are commonly-referred to as "negatively amortizing." The Court will use that
term throughout this ruling when referring to the various terms and conditions of in the ARM
Note that resulted in the principal of the loan increasing, rather than decreasing, over time if
Plaintiffs made only the minimum monthly payments.

Along with the various agreements the executed on April 16, 2008, Plaintiffs were given several disclosures and acknowledgements.  One of those documents, the "Fixed Advantage Pick-A-Payment Loan Disclosure" (the "Loan Disclosure"), contained information relating to the overall terms of their loan, which, as discussed above, was designated by the same title.  As with the ARM Note, the title of the Loan Disclosure was followed by a statement in bold-faced type that "(Monthly Interest Rate Changes)."  (Def.'s Answer, Ex. D at 1.)  While that statement appeared in slightly smaller type than the one on the ARM Note, in the case of the Loan Disclosure it was also followed by another line, which informed Plaintiffs that they were entering an "ADJUSTABLE RATE MORTGAGE."  (Id.)

Like the ARM Note, the Loan Disclosure informed Plaintiffs that their monthly interest rate would vary.  (Id.)  In fact, the Loan Disclosure explained in detail the relevant information about the so-called "Cost of Savings Index" on which variations in Plaintiffs' interest rate would be based.  (Id.)  It reiterated the provisions of the ARM Note that provided that Plaintiffs' interest rate would be adjusted each month while their minimum payment would change annually.  (Id.)  Finally, the Loan Disclosure explained the negative amortization features of Plaintiffs' mortgage, stating:

> At various times during the life of your loan the monthly payment may not be sufficient to pay the full amount of interest due.  This can occur if the initial payment amount that you select is less than the full amount of interest due.  This can also result from increases in the interest rate prior to the Payment Change Date or from a monthly payment that did not increase sufficiently to pay the full amount of interest due because of the 7-1/2% Payment Cap.  If the monthly payment is not sufficient to pay the full amount of interest due, the Lender adds this accrued but unpaid interest, called Deferred Interest, to the unpaid principal

balance of the loan.  Until repaid, Deferred Interest bears interest at the interest rate of the loan.

(Id. at 1-2.)

Mr. Billero signed and dated the Loan Disclosure on a line that appeared directly under a

paragraph stating:

> I have received a copy of this disclosure describing the Fixed Advantage Pick-A-Payment Loan Program.  I understand that this disclosure is neither a commitment to make a loan nor a binding contract.  The complete contractual terms and conditions of the loan are in the [ARM] Note, Security Instrument, Modification(s), and Rider(s), if any.

(Id. at 2.)

In addition to the Loan Disclosure – which related to the overall terms of their loan –

Plaintiffs received several acknowledgments and disclosures dealing with specific provisions of

the ARM Note.  One of those documents, a two-page form titled "Deferred Interest

Acknowledgement," informed Plaintiffs that:

> You have selected a loan product that lets you choose how much you pay each month from among several choices on your billing statement.  As described below, if you make a periodic payment that is less than the interest owing on the loan, you will incur deferred interest and the principal balance of your loan will increase.

(Def.'s Answer, Ex. C at 1.)

The next paragraph appeared under the heading, "WHAT IS DEFERRED INTEREST?," and

stated that:

> Deferred interest (also known as negative amortization) occurs if your mortgage payment is not large enough to pay all of the scheduled interest due on your loan.  For example, if you owe $1,000 in interest in a given period but you make a $900 payment that is authorized for your loan, the $100 shortfall is deferred interest that is added to your loan balance.  In subsequent months, you will be charged interest on the higher principal balance.  You can pay down any deferred interest on your loan at any time.

(Id.)

Under a heading titled "HOW MUCH SHOULD YOU PAY?," the Deferred Interest

Acknowledgement described situations in which it might be advantageous for the Plaintiffs to

pay more than their minimum monthly payment, stating in relevant part:

> **The Advantages of Paying more than the Minimum Payment.**   When you
> make more than the Minimum Payment, you can:
>
> - Reduce the total interest you pay over the life of the loan
>
> - Build equity in your home faster …
>
> - Save money on taxes by deducting the interest you pay (consult your tax
>   advisor)
>
> **Choosing the Minimum Payment.**   You may want to choose the Minimum
> Payment in months when you are managing your cash flow to:
>
> - Pay of credit card or other debts that charge higher interest than your
>   Wachovia Mortgage, FSB loan
>
> - Pay for unanticipated events, such as auto repairs or hospital bills
>
> - Invest in your employer's retirement plan or build a college fund for your
>   children
>
> Although making the Minimum Payment may make sense from time to time, it
> may be in your financial interest to pay more than the Minimum Payment as often
> as you can and to periodically pay down all or part of any accumulated deferred
> interest.

(Id.)

Finally, the Deferred Interest Acknowledgement informed Plaintiffs that they could "pay down a

deferred interest balance, in full or in part, at any time without penalty."  (Id. at 2.)  Both

Plaintiffs signed the Deferred Interest Acknowledgement on lines that followed a paragraph

stating that "I have read and understand this Deferred Interest Acknowledgment and have been

given an opportunity to discuss the deferred interest feature with a representative from Wachovia Mortgage, FSB."  (Id. at 2.)

Another of the disclosures Plaintiffs received on April 16, 2008, which was titled "Prepayment Fee Acknowledgement," dealt specifically with the ARM Note's provision imposing a fee of two percent on any monthly payment of more than $5,000 during the first three years of the loan term.  See (Def.'s Answer, Ex. A at Id. at 3, ¶ 5.)  That Acknowledgement restated the prepayment provision of the ARM Note.  (Def.'s Answer, Ex. H at 1.)  It then stated that, by signing the document, Plaintiffs acknowledged that (1) they were aware of the provision, (2) they had been given an opportunity to discuss it with representatives of Wachovia, and (3) that the prepayment fee was included in the Truth In Lending Act disclosure given to them at the time they entered the loan, which will be discussed at length below.  (Id. at 1.)  Plaintiffs both signed the Prepayment Fee Acknowledgement.

Yet another disclosure given to Plaintiffs when they entered the loan on April 16, 2008, a one-page document titled "Notice of Right to Cancel – General" informed them that they could dissolve their loan without any cost at any point up to three days after they entered the various agreements discussed above.  (Def.'s Answer, Ex. H.)  The Plaintiffs each signed a copy of that disclosure.  (Id.)

The final document given to Plaintiffs on April 16, 2008 that is relevant for the purposes of this ruling was titled "Federal Truth In Lending Act Disclosure" (the "TILA Dislcosure").[3] (Def.'s Answer, Ex. F.)  That Disclosure noted that the total cost of Plaintiffs' loan – the amount of interest they would pay over its 30-year term – would be $462,338.18 if they did not deviate from the minimum payment schedule.  (Id.)  Under that schedule, Plaintiffs were required to make initial monthly payments of $1,113.47 until June 15, 2013, at which time their payments

---

[3] The statute on which that disclosure was based will be discussed in more detail below.

would increase to $1,196.98 per month.[4]  (Id.)  Thereafter, Plaintiffs' payments would increase

each year by the maximum amount allowed under the 7.5 percent yearly Payment Cap provision

until June 15, 2018, when Plaintiffs would be required to pay $2,216.92 per month.  (Id.)  After

20 years of payments at that rate, Plaintiffs' loan would be discharged in full.  (Id.)  Additionally,

the TILA Disclosure informed Plaintiffs' that they would be charged a five percent fee for any

late payments.  (Id.)  Both Plaintiffs signed a copy of the TILA Disclosure.  (Id. at 1-2.)  Their

signatures appear directly beneath a clause stating that "[b]y signing below, you acknowledge

that you received a copy of this FEDERAL TRUTH IN LENDING ACT DISCLOSURE."  (Id.)

     Alleging that Defendants engaged in deceptive practices and violated several state and

federal laws by inducing Plaintiffs to enter the loan discussed above, Plaintiffs filed a 15-count

Complaint against Wachovia, NFM, the NFM employee who organized their loans, 12 fictitious

individual "John Doe" defendants, and 10 fictitious corporations in the Superior Court of New

Jersey on February 22, 2010.  Wachovia removed the action to this Court, which has jurisdiction

under 28 U.S.C. § 1331 based on the fact that Plaintiffs assert claims under federal law, on April

6th of that year.  On April 27, 2010, Wachovia submitted an Answer in which it disputed

Plaintiffs' factual allegations and asserted various affirmative defenses.

## II. DISCUSSION

     Wachovia now moves pursuant to Federal Rule of Civil Procedure 12(c) for judgment on

the pleadings dismissing the claims asserted against it in Plaintiffs' Complaint.  Many of those

claims are based on nonsensical allegations – i.e., the Complaint's assertion that "the plaintiff

created an enterprise in which consumers were induced into accepting mortgages that they would

not otherwise have agreed to." (Compl. ¶ 46) (emphasis added.)   Others are either premised on

---

[4] The Payment Cap provision and the amount by which the Plaintiffs' monthly payments could
be increased each year are detailed above in the discussion of the ARM Note's terms.

conclusory assertions of law or are directly contradicted by the loan documents discussed above. For the sake of brevity, the Court will limit its discussion of Plaintiffs' allegations and the parties' legal arguments to those points that are directly relevant to this ruling, and will refrain from summarizing each of Plaintiffs' claims except while analyzing their legal merit below.

## A.  Standard of Review

A motion to dismiss for failure to state a claim upon which relief can be granted is normally premised on Federal Rule of Civil Procedure 12(b)(6), and must be made before the defendant files a responsive pleading.  However, a defendant who has already answered may raise that defense in a motion for judgment on the pleadings submitted pursuant to Rule 12(c). Fed. R. Civ. P. 12(h)(2)(B).  Because it requests the same relief (dismissal) and is based on the same rationale (failure to state a cognizable claim) a motion premised on Rule 12(c) must be assessed under the same standard of review as requests for dismissal pursuant to Rule 12(b)(6). Turbe v. Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991).

Under that standard, the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court's inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims."  In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the Rule 12(b)(6)/12(c) standard in two cases: Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief."  In contrast, Bell Atlantic, 550 U.S. at 545, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Thus, the assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," id. at 570, meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged."  Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  Iqbal, 129 S. Ct. at 1949.  Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation."  Id. at 1950.  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  Id.

When a claim is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) or 12(c), leave to amend and reassert that claim is ordinarily granted.  In re Burlington Coat Factory Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).  A claim may be dismissed with prejudice, however, if amending the complaint would be futile.  Id.  "Futile," as used in this context, means that the

13

complaint could not be amended to state a legally-cognizable claim.  Id. (citing Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996)).

## III.  ANALYSIS

The Complaint in this case is best characterized as a quintessential example of "kitchen sink" pleading – Plaintiffs apparently brought every claim their attorney could possibly think of in the hope that one or more might be cognizable, regardless of whether the circumstances under which the case arose supported their allegations.  See Tillbury v. Aames Home Loan, 199 F. App'x 122, 123-24 (3d Cir. 2006) (referring to a complaint that asserted similar claims as an "'everything but the kitchen sink' pleading in which [plaintiffs] sue[d] almost everyone 'under the sun.'").  The Complaint includes 15 claims, each of which appears to be asserted against all Defendants, including Wachovia.[5]  Some, such as Plaintiffs' assertion that the Defendants violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., at least relate to the circumstances out of which the case arises, namely Plaintiffs' dissatisfaction with their mortgage. See (Compl. ¶¶ 67-78.)  Others are completely ridiculous, such as Plaintiffs' contention – despite the fact that they are of opposite sexes and the loan was granted to them jointly – that Defendants violated the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 et seq., by engaging in disparate lending on the basis of gender.  See (Compl. ¶ 137-38.)

Of particular note is the fact that each of Plaintiffs' claims is asserted against all Defendants; at no point does the Complaint distinguish as to which of those Defendants committed the various acts in question.  In the absence of such information, it is impossible for

---

[5] Plaintiffs' Complaint is not a model of clarity.  In each claim, it refers to "the defendants, John Does and ABC Corporations."  The placement of a comma between "defendants" and "John Does" leads the Court to believe that the Plaintiffs meant the former term to refer to those Defendants with known identities:  Wachovia, NFM, and the NFM employee who organized Plaintiffs' loan.  Therefore, the Court will construe each of Plaintiffs' claims as being asserted against Wachovia for the purposes of this ruling.

either the Court or the Defendants to ascertain the exact nature of their alleged wrongdoing.[6]  See Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (A Complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests.") (internal citations omitted).

But a lack of specificity is not the only – or even the most important – deficiency in Plaintiffs' Complaint.  To the contrary, a closer examination of Plaintiffs' claims reveals two categories that must be dismissed with prejudice.  The first includes Plaintiffs' federal claims under the TILA, RESPA, and HOEPA, which are time-barred.

The second category is made up of state law claims that must be dismissed with prejudice because the allegations in Plaintiffs' Complaint demonstrate conclusively that they lack merit.  Specifically, Plaintiffs' assert that Defendants violated New Jersey's version of the Racketeer Influenced Corrupt Organizations Act ("NJRICO"), N.J. Stat. Ann. § 2C:41-1, et seq., by seeking to collect an "unlawful debt."  However, the allegations in their Complaint demonstrate that their loan was not an "unlawful debt" as defined by the statute.  Similarly, Plaintiffs assert a breach of contract claim based on pre-contractual promises that conflict with the express terms of the ARM Note and Mortgage agreement they executed on April 16, 2008.  That claim represents an improper attempt to expand or modify the terms of their loan contracts based on parol evidence.

Since Plaintiffs' federal claims must be dismissed with prejudice, the Court declines pursuant to 28 U.S.C. § 1367(c)(3) to exercise supplemental jurisdiction over their remaining state law claims.[7]

---

[6] For example, Plaintiffs' Complaint does not specify whether it was Wachovia, NFM, or the individual NFM broker that allegedly "induced [P]laintiffs to refinance their home for the sole purpose of stripping the equity out of their house."  (Compl. ¶ 76.)
[7] This Court does not have diversity jurisdiction under 28 U.S.C. § 1332 because Plaintiffs and Defendant NFM are both citizens of New Jersey.

## A.  Federal Claims

As discussed above, Plaintiffs assert federal claims under the TILA, RESPA, and

HOEPA.  The Court will address those claims in turn.

### i.        *Count One – Violations of the Truth In Lending Act*

Plaintiffs' first claim asserts that Defendants committed violations of the TILA.

Specifically, Plaintiffs allege that:

> The defendants, John Does and ABC Corporations violated TILA by either failing
> to provide [P]laintiffs with a timely and adequate Notice of Right to Cancel the
> loans and/or by providing them with inaccurate and/or conflicting loan documents
> and/or by making false promises and representations which interfered with the
> plaintiffs' ability to assess the transactions and/or not providing them with
> required timely Adjustable Rate Mortgage Brochure and the other detailed ARM
> information, which must be delivered not later than three business days after the
> creditor receives the consumers' application.

(Compl. ¶ 74.)

The first assertion – that Wachovia and the other Defendants did not provide Plaintiffs

with notice that they could cancel their loan – is demonstrably false.[8]  As discussed above,

Wachovia served Plaintiffs with a document titled "Notice of Right to Cancel – General" on

April 16, 2008 when they executed the other loan documents.  See (Def.'s Answer, Ex. H.)  The

Plaintiffs each signed a copy of that disclosure.  (Id.)  Nor is there any evidence that Wachovia or

the other Defendants provided inaccurate or conflicting loan documents.  To the contrary, the

documents discussed above are consistent with each another, and set forth the terms and

---

[8] The Plaintiffs' Complaint is rife with allegations that are demonstrably false.  For example,
another section of Plaintiffs' Complaint includes one of the few allegations that appears to be
aimed specifically at Wachovia, stating, "The lender provided an adjustable rate mortgage; its
contrary disclosure constitutes a violation of the Truth-in-Lending-Law."  (Compl. ¶ 20.)  Again,
that contention is demonstrably false – the loan documents discussed above clearly stated that
Plaintiffs' loan was an "adjustable rate mortgage."  See, e.g., (Def.'s Answer, Ex. E at 1) (Loan
Application); (Def.'s Answer, Ex. A at 1) (ARM Note); (Def.'s Answer, Ex. D at 1) (Loan
Disclosure); (Def.'s Answer, Ex. F) (TILA Disclosure).  Bearing in mind his duties as an Officer
of the Court, Plaintiffs counsel should undertake a review of the Plaintiffs' loan documents and
remove such allegations from any Amended Complaint filed pursuant to this ruling.

conditions of Plaintiffs' loan in exhaustive and accurate detail.[9]  Similarly contradicted by the loan documents is Plaintiffs' contention that the Defendants "made false promises" that interfered with their ability to "accurately assess the transaction."  (Compl. ¶ 74.)  Plaintiffs do not allege that representatives of the Defendants placed any limit on the amount of time they could spend reviewing the various loan documents.  To the contrary, they apparently did not read those documents before signing.  See (Compl. ¶ 15.)  If they had, Plaintiffs would have been familiar with the terms of their loan; as discussed above, the ARM Note and its accompanying disclosures clearly explained those terms, including the negative amortization features.

Even if Plaintiffs' factual allegations were not contradicted by the undisputedly authentic documentary evidence in the record, their TILA claims would be time-barred.  Under 15 U.S.C. § 1640(e), TILA actions must be asserted "within one year from the date of the occurrence of the violation" of that statute.  The one-year statute of limitations "begins to run on the date the loan closed."  In re Cmty. Bank of N. Va., 622 F.3d 275, 303 (3d Cir. 2010).  Thus, Plaintiffs were required to assert their TILA claim on or before April 16, 2009.  Instead, they filed their Complaint on February 22, 2010 – over ten months after the statute of limitations for their TILA claims expired.

Plaintiffs now contend their TILA claims should be allowed to proceed under the doctrine of equitable tolling.  In doing so, they correctly note that the statute of limitations contained in the TILA is not jurisdictional, and equitable tolling may therefore save claims that are not asserted within that one-year time limit.  Ramadan v. Chase Manhattan Grp., 156 F.3d

---

[9] In their other claims, Plaintiffs point to various portions of the loan documents – including the TILA Disclosure – which they contend were inaccurate.  For the reasons discussed below, Plaintiffs' contentions to that effect are either erroneous or, in the case of their time-barred claims, irrelevant.

499, 504 (3d Cir. 1998).  However, Plaintiffs claims do not meet the criteria for the application

of that doctrine.

It is well-established that "the rule of equitable tolling is to be used sparingly."

Seitzinger v. Reading Hosp. & Med. Ctr., 165 F.3d 236, 237 (3d Cir. 1999).  "Procedural

requirements established by Congress for gaining access to the federal courts are not to be

disregarded by courts out of a vague sympathy for particular litigants."  Baldwin County

Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1984).  Accordingly, equitable tolling is generally

limited to three circumstances:  "(1) where the defendant has actively misled the plaintiff

respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has

been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his

or her rights mistakenly in the wrong forum."  Oshiver v. Levin, Fishbein, Sedran & Berman, 38

F.3d 1380, 1387 (3d Cir. 1994).

Plaintiffs do not meet any of those three criteria.  While they claim that they were

"actively misled" by Wachovia and the other Defendants with respect to the terms and conditions

of their loan, the Plaintiffs have not alleged that the Defendants somehow convinced them after

they consummated that loan on April 16, 2008 that they would be unable to assert a claim under

the TILA.  Nor could they, as the undisputedly authentic documentary evidence in the record

demonstrates that Plaintiffs reviewed and signed the various loan documents and disclosures on

which they base their claims on April 16, 2008.  In fact, none of the allegations in Plaintiffs'

Complaint relate to actions taken by the Defendants after April 16, 2008.  Rather, they claim that

representatives of the Defendants informed them before that time that their loan would be a fixed

rate mortgage, and failed to serve them with the proper disclosures on April 16, 2008, the date

they entered into the loan.  Such allegations could have been made at any point after April 16,

2008.  Therefore, the Court rejects Plaintiffs' assertion that equitable tolling applies because they were "actively misled."

The record is similarly devoid of evidence that Plaintiffs were "prevented in some extraordinary way from asserting [their] rights."  See Id.  Plaintiffs have not alleged that they were somehow precluded from filing suit – they simply argue that they weren't aware of the Defendants' violations until "December 2009."  (Pls.' Br. 3.)  But that unawareness is attributable to a lack of diligence on the part of the Plaintiffs.  See Id. at 1390 (For equitable tolling to apply, a plaintiff must show "that he or she could not, by the exercise of reasonable diligence, have discovered the essential information bearing on his or her claim.").  They could have reviewed the loan documents detailed in this ruling either before they signed them on April 16, 2008 or at any time thereafter.  Moreover, in light of the negative amortization features discussed above, even a cursory review of their monthly statements would have informed Plaintiffs that the principal of their loan was increasing.

Finally, Plaintiffs did not "timely assert[] [their] rights mistakenly in the wrong forum."  Id. at 1387.  While Plaintiffs initially filed suit in the Superior Court of New Jersey, it is undisputed that they  did not do so until February 22, 2010 – over ten months after the statute of limitations contained in 15 U.S.C. § 1640(e) expired.  Therefore, the Court finds that equitable tolling does not apply to Plaintiffs' TILA claims, and will dismiss those claims with prejudice.

### ii.    *Count Nine – Violations of the Real Estate Settlement Practices Act*

Plaintiffs' claims under the Real Estate Settlement Practices Act ("RESPA"), 12 U.S.C. §§ 2601-2617, must also be dismissed.  In their Complaint, Plaintiffs assert claims under three sections of that statute: §§ 2601, 2607, and 2617.  The first, § 2601, simply contains the findings of Congress that motivated it to pass the statute and a statement of purpose, but does not include

any substantive provisions conferring rights on borrowers like the Plaintiffs or prohibiting activities by lenders and loan services such as the Defendants.  12 U.S.C. § 2601.  The third, § 2617, relates to the duties imposed by the RESPA on the Secretary of Housing and Urban Development and, like § 2601, does not confer a private right of action on borrowers like the Plaintiffs.

The other section on which Plaintiffs' base their claims, § 2607, includes a private right of action, but the RESPA requires that suits seeking to enforce that right be brought within one year of the violation out of which they arise.  12 U.S.C. § 2614 ("Any action pursuant to provisions of section … 2607 … of this title may be brought … within … 1 year in the case of a violation of section 2607 … of this title from the date of the violation.").  As discussed above with reference to their TILA claim, that one-year statute of limitations expired long before Plaintiffs filed this suit.

Plaintiffs now contend, much as they did with their TILA claim, that the statute of limitations contained in the RESPA is not jurisdictional, and the Court should apply equitable tolling to allow their claims to proceed.  The former issue – whether or not RESPA's statute of limitations is jurisdictional – has never been addressed by the Court of Appeals for the Third Circuit and is a matter of conflict among other Courts of Appeal.  See Cmty. Bank of N. Va., 622 F.3d at 307 (citing conflicting precedents from other circuits).  The Court need not decide that issue in this case, as its ruling that equitable tolling does not apply to Plaintiffs' TILA claims, see supra at II(B)(i), applies with equal force to their claims under the RESPA and requires that those claims be dismissed with prejudice.

### iii.    Count Fifteen – Violations of the Home Ownership and Equity Protection Act

Finally, Plaintiffs' claims under the Home Ownership and Equity Protection Act

("HOEPA"), 15 U.S.C. §§ 1639-1639h, must be dismissed.  The HOEPA was "enacted as an

amendment to TILA," and "applies to a special class of regulated loans that are made at higher

interest rates and are subject to special disclosure requirements."  Cmty. Bank of N. Va., 622

F.3d 275, 282-83 (3d Cir. 2010).  The same one-year statute of limitations that applies to claims

under the TILA, which contained in 15 U.S.C. § 1640(e), governs the timeliness of HOEPA

claims.  Id. at 303 ("[A] claim for damages under the TILA and HOEPA … is subject to a one-

year limitations period that begins to run from the date the loan closed.") (citing 15 U.S.C. §

1640(e).  Therefore, the fact that Plaintiffs did not assert their claims within one year of the date

on which they consummated their loan, when coupled with the Court's ruling that equitable

tolling is inappropriate in this case, see supra at II(B)(i), requires that their HOEPA claims be

dismissed with prejudice.

## B.  NJRICO and Breach of Contract Claims

Plaintiffs' own allegations demonstrate conclusively that they will be unable to prove

their NJRICO and breach of contract claims.  Therefore, those claims must be dismissed with

prejudice.

### i.    Count Three – Violations of the New Jersey Racketeer Influenced Corrupt Organizations Act

In their third count, Plaintiffs assert claims against all Defendants under NJRICO.

Specifically, Plaintiffs assert that "defendants ... have engaged in a pattern of corrupt activity in

order to seek the collection of an unlawful debt from Plaintiffs."  (Compl. ¶ 88.)  That allegation,

even when read in concert with the other factual assertions in the Complaint, comes nowhere

near what would be needed to sustain Plaintiffs' NJRICO claims.[10]  In fact, the Plaintiffs' own allegations demonstrate conclusively that their NJRICO claim lacks merit.

The NJRICO statute confers a private right of action to pursue a civil suit on "[a]ny person damaged in his business or property by reason of a violation of N.J. Stat. Ann. § 2C:41-2."  N.J. Stat. Ann. § 2C:41-4.  In order to demonstrate a violation of N.J. Stat. Ann. § 2C:41-2, a plaintiff must demonstrate that the defendant "collected an unlawful debt" as part of an "enterprise" or through a "pattern of racketeering activity."  An "unlawful debt" is defined as a debt:

(1) Which was incurred or contracted in gambling activity which was in violation of the law of the United States, a state or political subdivision thereof; or

(2) Which is unenforceable under state or federal law in whole or in part as to principal and interest because of the laws relating to usury.

N.J. Stat. Ann. § 2C:41-1(e).

Obviously the first situation does not apply in this case; Plaintiffs' loans were not incurred through illegal gambling.  The second situation – usury – is similarly inapposite.  New Jersey's threshold rate for usury is "30% per annum."  N.J. Stat. Ann. § 2C:21-19(a)(2).  Federal law does not set a specific threshold for usury, but the definition of "unlawful debt" contained in the federal RICO statute provides that a rate of interest is "usurious" if it is "at least twice the enforceable rate under state law."  18 U.S.C. § 1961(6).  N.J. Stat. Ann. § 31:1-1(b) states that a loan securing a first lien on a home will be unenforceable if its interest rate exceeds the long-term Treasury Bond rate set by the Federal Reserve applicable two months before the loan was

---

[10] In another portion of their NJRICO claim, Plaintiffs allege in a conclusory – and totally unsupported – manner that the Defendants engaged in various illegal activities.  See (Compl. ¶ 93.)  Those allegations do not distinguish between the various Defendants, point to any specific illegal act (rather than asserting general illegality), or include any other information that would be sufficient to sustain their claims.  Therefore, they must be disregarded.  Iqbal, 129 S. Ct. at 1950 (A court is "not bound to accept as true a legal conclusion couched as a factual allegation.").

entered plus 8 percent – a figure that would result in interest of approximately 12.25 percent in this case.[11]  Thus, a "usurious" rate under the Federal RICO statute would be approximately 24 percent.  Plaintiffs assert in connection with their other claims that the true interest rate on their loan was 11.745 percent per annum.  Thus, their own allegations establish that the loan out of which this case arises was not an "unlawful debt" as that term is defined by N.J. Stat. Ann. § 2C:41-1(e), and requires that their NJRICO claims be dismissed with prejudice.

### ii.      Count Eight – Breach of Contract

Plaintiffs' breach of contract claim fails as a matter of law.  That claim is based on two allegations.  First, Plaintiffs assert that they were "told by defendants, John Does and ABC Corporations that their monthly payments would be lower than the actual payments required under the loan terms." (Compl. ¶ 115.)  They then contend that "[s]ince the plaintiffs did not receive the agreed upon terms promised by the defendants, John Does and ABC Corporations, the contract was breached." (Compl. ¶ 116.)

Were they not conclusory and completely lacking in detail, Plaintiffs' allegations might support a claim that they were fraudulently induced to enter the loan agreements discussed above – a claim that would be wholly duplicative of their NJCFA and common law fraud causes of action.[12]  Those allegations cannot, however, sustain a breach of contract claim.  There is no indication that any Defendant violated the terms of the ARM Note or any other agreement.  To the contrary, Plaintiffs base their claim entirely on pre-contractual promises that allegedly

---

[11] All Treasury rates cited in this ruling are drawn from the historical rate data set forth in the "Resource Center" section of the Treasury Department's website, http://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yield.

[12] Plaintiffs allege in their Complaint that they were promised that the monthly payments on their loan would be $1,113.75.  (Compl. ¶ 14.)  The ARM Note provided for monthly payments of $1,113.47.  (Def.'s Answer, Ex. A at 2, ¶ 3(B).)  Given those facts, it is unlikely that Plaintiffs will be able to assert a cognizable fraud claim based on an allegation that their monthly payment was greater than they expected.

differed from what they eventually agreed to by executing the ARM Note.  Evidence of such

promises, commonly referred to as "parol evidence," "is adducible only for the purpose of

interpreting [a contract] – not for the purpose of modifying or enlarging or curtailing its terms."

Atl. N. Airlines v. Schwimmer, 96 A.2d 652, 656 (N.J. 1953); see also Conway v. 287 Corp. Ctr.

Assocs., 901 A.2d 341, 346 (N.J. 2006).  Therefore, Plaintiffs' breach of contract claims must be

dismissed with prejudice.

## IV.  CONCLUSION

For the reasons set forth above, Wachovia's Motion for Judgment on the Pleadings is

granted.  The claims contained in Counts One, Three, Eight, Nine, and Fifteen of Plaintiffs'

Complaint are dismissed with prejudice.  The Court declines pursuant to 28 U.S.C. § 1367(c)(3)

to exercise supplemental jurisdiction over Plaintiffs' remaining claims, which are premised on

state law.

The Court will enter an Order implementing this Opinion.


_s/ Dickinson R. Debevoise___ _____
DICKINSON R. DEBEVOISE, U.S.S.D.J.


Dated:  December 14, 2010